IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

IMANI CREECH,                        )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )          1:22-cv-852
                                     )
LANE AND ASSOCIATES,                 )
                                     )
          Defendant.                 )

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Before this court is Defendant's Motion for Summary
Judgment, (Doc. 41). For the reasons stated herein, Defendant's
motion will be granted.

I.   **FACTUAL BACKGROUND**

Defendant Lane & Associates is a family dentistry practice
based in North Carolina. (Ex. 1, Lane & Associates Employee
Handbook ("Employee Handbook") (Doc. 41-3) at 10–11.)[1] Defendant
hired Plaintiff on June 17, 2020, to serve as a "Dental
Assistant II" in Defendant's Durham office. (Heather Barefoot
Aff. (Doc. 43-1) at 3.)

---

[1] All citations in this Memorandum Opinion and Order to
documents filed within the court refer to the page numbers
located at the bottom right-hand corner of the documents as they
appear on CM/ECF.

Defendant's employee handbook states that its employees are employed "at-will" and that their "employment may be terminated with or without cause, and with or without notice at any time." (Ex. 1, Employee Handbook (Doc. 43-1) at 13.) Additionally, the handbook outlines various "Attendance and Leave Policies." (See id. at 24–26.) One of these policies states that employees must "inform [their] supervisor by telephone" as soon as they know they "will be late to work or absent from work." (Id. at 25.) Employees who fail "to report to work for three (3) consecutive days without proper notification will be deemed to have voluntarily abandoned [their] job, and [their] employment will be automatically terminated." (Id.) Plaintiff signed a form acknowledging these policies and agreeing "to adhere to" them at the time she was hired. (See Ex. 4, Acknowledgement of Receipt and Review of Employee Handbook ("Acknowledgement") (Doc. 41-2) at 53.)

On Wednesday, December 2, 2020, shortly after 10:00 a.m., Plaintiff texted two of her supervisors, Heather Barefoot (Defendant's Clinical Operations Supervisor) and Daphne Fuller (one of Plaintiff's direct supervisors), to inform them that she was sick, that she was presently in the hospital, and that her ailment may require surgery. (See Pl.'s Suppl. Pleading (Doc.

- 2 -

25) at 11, 15; see also Heather Barefoot Aff. (Doc. 41-3) at 1, 4.)

Later that day, at 1:20 PM, Plaintiff texted Daphne to confirm she "will not be in [Thursday] or Friday." (Pl.'s Suppl. Pleading (Doc. 25) at 15.) Daphne responded: "I've communicated with Heather and I will need a letter upon your return. I hope you feel better!" (Id.)

Fifteen minutes later, at 1:35 PM, Heather texted Plaintiff: "I am sorry you are sick and Daphne informed me you are out until Friday." (Id. at 12.) Plaintiff responded to Heather that she "was definitely getting surgery [Thursday] or Friday" to correct her "pancreatitis and gallstones." (Id.) Heather replied that she would "inform our HR department along with the office th[at] you will be out of work." (Id. at 13.)

Early Friday morning, December 4, at 7:41 AM, Daphne checked back in with Plaintiff, texting her: "Hope all is well with you!!" (Id. at 15.) Plaintiff responded twenty-four hours later, on Saturday morning, December 5: "I'm coming along having two surgeries back to back is very hard. Hopefully I get to go home today . . . Thanks for checking in on me." (Id. at 16.) After Plaintiff's text message to Daphne on Saturday morning, December 5, neither Daphne, Heather, nor any member of Defendant's Human Resources ("HR") team heard from Plaintiff

- 3 -

again until the following Friday, December 11, when Plaintiff

texted Daphne and Heather to inform them that she intended to

return to work on Monday, December 14, 2020. (Id. at 14, 16.)

In the intervening time, on Monday, December 7, at 9:40 AM,

Leigh-Anne Ennis, another of Plaintiff's direct supervisors,

(Heather Barefoot Aff. (Doc. 41-3) at 4), sent a group text

message to Plaintiff, copying Heather and Daphne, which stated:

> Good morning Imani. You have been out since Dec
> 02,2020 without letting me know why you would be out.
> You have not reached out to update me on your status
> and when you will return. I hope all is well but I do
> need you to communicate with me in regard to whether
> you are ok and when you will be returning please. I
> only know that you may have been at the hospital for
> a surgery because per staff you have been in
> communication with them but I have yet to hear or
> read anything from you. Have you communicated with
> Human Resources about your status or Heather Barefoot
> because you have not with myself or Daphne. Looking
> forward to your response. Thank you.

(Ex. 8, Group Text Message Between Leigh-Anne, Heather, Daphne,

& Plaintiff ("Leigh-Anne Message") (Doc. 41-3) at 63-64.) The

record in this case does not indicate that Plaintiff responded

to Leigh-Anne's text message and this court finds as a fact that

Plaintiff did not respond to this text.

Plaintiff cites no evidence to suggest she responded to

Leigh-Anne's text or that she communicated in other ways with

Daphne, Heather, Leigh-Anne, or members of Defendant's HR

department while she was absent from work between December 7 and

- 4 -

December 9. However, Plaintiff did exchange a series of text messages with another Lane & Associates employee, Candice Lane, shortly after 5:00 PM on Monday, December 7. (Pl.'s Suppl. Pleading (Doc. 25) at 9; Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. ("Def.'s Mem.") (Doc. 42) at 5.) In these texts, Candice wished Plaintiff well in her recovery from surgery and Plaintiff responded, thanking Candice, and asked, "How was work today[?]" (Pl.'s Suppl. Pleading (Doc. 25) at 9.) But Plaintiff did not ask Candice to approve additional time off work beyond the Friday, December 4, timeline she had explicitly communicated to Heather and Daphne, (see id. at 12, 15), nor did Plaintiff request that Candice pass along any messages to Heather, Daphne, or anyone else about Plaintiff's need for a prolonged absence. (see id. at 9–10.)

After Plaintiff failed to show up to work and failed to communicate with her supervisors on Monday, December 7, Tuesday, December 8, and Wednesday, December 9, Defendant terminated Plaintiff's employment, (see Ex. 5, Notice of Employee Seperation [sic] ("Separation Notice") (Doc. 41-2) at 57), citing the clause in the employee handbook that calls for the automatic termination of employees who fail to report to work or communicate with their supervisors for three consecutive days. (See id.; see also Ex. 1, Employee Handbook (Doc. 41-3) at 25.)

- 5 -

## II.  **PROCEDURAL HISTORY**

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and received a right to sue letter on May 6, 2022. (See Pl.'s Suppl. Pleading (Doc. 25) at 1.) Plaintiff, proceeding pro se, then initiated a lawsuit in the United States District Court for the District of New Jersey on August 1, 2022, alleging that her firing violated the Americans with Disabilities Act of 1990 ("ADA") and Title VII. (See Doc. 1.) She filed an Amended Complaint on October 6, 2022. (Am. Compl. (Doc. 9).) Plaintiff's case was transferred to the United States District Court for the Middle District of North Carolina on October 7, 2022. (Doc. 11.)

On November 17, 2022, Defendant filed a Motion to Dismiss, (Doc. 19), and on August 30, 2023, this court issued an order requiring Plaintiff to file a supplemental pleading to address deficiencies in her Amended Complaint, (Doc. 24). On September 21, 2023, Plaintiff filed a Supplemental Pleading. (Pl.'s Suppl. Pleading (Doc. 25).) The next day, this court denied without prejudice Defendant's Motion to Dismiss. (Doc. 27.) Defendant then filed an Answer to Plaintiff's Amended Complaint, (Doc. 28), and the parties proceeded to discovery.

On April 26, 2024, Defendant filed a Motion to Compel Discovery, (Doc. 38), alleging that Plaintiff had failed to

- 6 -

appear for her deposition, produce records, and respond fully to written interrogatories, (id. at 1-7). Defendant also filed a Motion for Summary Judgment on June 3, 2024, (Def.'s Mot. for Summ. J. ("Def.'s Mot.") (Doc. 41)), and a supporting memorandum on June 5, 2024, (Def.'s Mem. (Doc. 42)). Plaintiff responded to Defendant's Motion for Summary Judgment on June 13, 2024. (Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 44).)

Another court in this district issued a text order on June 17, 2024, granting in part Defendant's Motion to Compel. (Docket Entry 06/17/24.) After Plaintiff appeared for a deposition on June 21, 2024, (see Ex. 2, Pl. Dep. (Doc. 47-1) at 5-142), Defendant filed a Supplemental Memorandum in Support of its Motion for Summary Judgment, (Def.'s Suppl. Mem. of Law in Supp. of Its Mot. for Summ. J. ("Def.'s Suppl. Mem.") (Doc. 47)). In its Supplemental Memorandum, Defendant noted that Plaintiff "failed to serve a copy of her response to Defendant's written discovery requests despite the Court's June 17, 2024 Order and undersigned counsel's multiple requests for her responses at Plaintiff's deposition." (Def.'s Suppl. Mem. (Doc. 47) at 2.) Defendant contends that, "[t]hrough Plaintiff's refusal to participate in discovery, Defendant has been unfairly impeded in

- 7 -

its ability to defend the case." (Id.)[2] Plaintiff responded in

opposition to Defendant's Supplemental Memorandum on July 17,

2024. (Pl.'s Opp'n to Suppl. Summ. of J. ("Pl.'s Suppl. Resp.")

(Doc. 48).)

Defendant's Motion for Summary Judgment, (Def.'s Mot. (Doc.

41)), is ripe and ready for review.

## III. **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine

dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex

Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). This court's

summary judgment inquiry is whether the evidence "is so one-

sided that one party must prevail as a matter of law." Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 251–252 (1986). The moving

party bears the initial burden of demonstrating "that there is

an absence of evidence to support the nonmoving party's

case." Celotex Corp., 477 U.S. at 325. If the "moving party

discharges its burden . . . , the nonmoving party then must come

forward with specific facts showing that there is a genuine

_____

[2] Defendant's frustration with Plaintiff's delayed, and at
times deficient, participation in discovery is justified.
Plaintiff's failure to abide by the rules and orders merits a
sanction. However, Plaintiff is proceeding pro se, the summary
judgment motion is ripe, and this court favors reaching the
merits.

issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714,
718-19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). "Conclusory or
speculative allegations do not suffice" to defeat
a motion for summary judgment. Thompson v. Potomac Elec. Power
Co., 312 F.3d 645, 649 (4th Cir. 2002). Summary judgment should
be granted "unless a reasonable jury could return a verdict for
the nonmoving party on the evidence presented." McLean, 332 F.3d
at 719.

## IV.  ANALYSIS

    Plaintiff's Amended Complaint does not identify a
cognizable claim for relief,[3] (see generally Am. Compl. (Doc.
9)), but her supplemental pleading specifies that she seeks
relief under the Americans with Disabilities Act of 1990
("ADA"), (see Pl.'s Suppl. Pleading (Doc. 25) at 5). The ADA
forbids employers from discriminating against qualified
individuals on the basis of their disabilities. See 42 U.S.C. §
12112. Here, Plaintiff appears to allege that Defendant
discriminated against her on the basis of her disabilities when

_____

    [3] Plaintiff invokes the Rehabilitation Act of 1973 in her
Amended Complaint, (see Am. Compl. (Doc. 9) at 3), but this Act
applies to the employment practices of federal agencies. See
Hannah P. v. Coats, 916 F.3d 327, 336 (4th Cir. 2019) (citing 29
U.S.C. § 794). Nothing in the record suggests that Defendant is
a federal agency or that Defendant receives funding from a
federal agency.

Defendant terminated her, (see Am. Compl. (Doc. 9) at 1), and when Defendant denied her "reasonable accommodation request for temporary leave," (Pl.'s Suppl. Pleading (Doc. 25) at 5). Pro se complaints are to be liberally construed, see Boag v. MacDougall, 454 U.S. 364, 365 (1982), and in the light most favorable to Plaintiff, this court considers Plaintiff's pleadings to assert ADA employment discrimination claims for (a) wrongful discharge and (b) denial of reasonable accommodation.

Generally speaking, a plaintiff can establish claims of employment discrimination through one of two avenues of proof: (1) the production of direct and indirect evidence of discrimination, or (2) the utilization of the McDonnell-Douglas burden-shifting method of proof. See Rhoads v. F.D.I.C., 257 F.3d 373, 391–92 (4th Cir. 2001); see also Young v. United Parcel Service, Inc., 575 U.S. 206, 228 (2015) (clarifying that the burden-shifting method is, itself, another method for showing "indirect evidence" of discrimination). A plaintiff pursuing the first avenue must produce "direct evidence of [a defendant's] stated purpose to discriminate" or "indirect evidence" that is "relevant to and sufficiently probative" of a defendant's discrimination. See Rhoads, 257 F.3d at 391 (cleaned up) (citations omitted). In other words, the plaintiff must produce "evidence of [the defendant's] conduct or statements

- 10 -

that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Id. at 391-92 (citation omitted).

Here, Plaintiff makes two attempts to produce direct evidence of discrimination, but both attempts fall short of establishing that Defendant demonstrated a "discriminatory attitude," see id., and otherwise fail to create a genuine issue of material fact. First, in her Amended Complaint, Plaintiff alludes to evidence of Defendant's supposed discriminatory attitude when she alleges: "[T]here were previous occasions that happened at the job where my job was threatened because I fell sick at the job and needed to go to urgent care." (Am. Compl. (Doc. 9) at 1.) When pressed by opposing counsel in her deposition to expound on these "occasions" of discrimination, Plaintiff testified that, on one occasion, her supervisors, Daphne and Heather, had been initially hesitant to allow her to take time off work for an illness, but eventually apologized and allowed her to take the time. (See Ex. 2, Pl. Dep. (Doc. 47-1) at 57; see also Pl.'s Suppl. Resp. (Doc. 48) at 5.) Plaintiff does not explain how this behavior was discriminatory nor clarify whether her illness on that occasion was related to an ADA-recognized disability. (See Ex. 2, Pl. Dep. (Doc. 47-1) at 57.) Even accepting as true Plaintiff's bare assertion that her

- 11 -

supervisors were hesitant to accept her request for time off on a previous occasion, this fact does not "bear directly on the contested employment decision[s]" at issue here, see Rhoads, 257 F.3d at 391–92, rather, the record shows that Plaintiff's supervisors promptly acquiesced to Plaintiff's request for time off between Wednesday, December 2, and Friday, December 4, 2020. (See Pl.'s Suppl. Pleading (Doc. 25) at 11–16.)

Second, while Plaintiff neglected to raise this point in her Amended Complaint, she appears to argue in a later-filed response memorandum that the circumstances of her termination evince discrimination by disparate treatment. (Pl.'s Suppl. Resp. (Doc. 48) at 3.) Specifically, Plaintiff contends that on previous occasions Defendant allowed other employees to miss work for extended periods of time and, unlike Plaintiff, Defendant did not terminate those employees. (Id.) However, Plaintiff does not allege, nor marshal facts to show, that these other employees also failed to adhere to the "Attendance and Leave Policies" outlined in Defendant's employee handbook. (Ex.

1, Employee Handbook (Doc. 41-3) at 24–26.) This omission[4] is fatal to Plaintiff's attempt at showing disparate treatment because Plaintiff was not fired only due to her absences from work, but rather for her lack of communication with her supervisors about those absences. (See Ex. 5, Separation Notice (Doc. 41-2) at 57 (citing Defendant's "No Show/No Call 3 days" policy as reason for Plaintiff's firing).) Thus, Plaintiff has offered no evidence at summary judgment upon which this court, or a reasonable jury, could find that Plaintiff faced disparate treatment.

Because Plaintiff has not forecast direct or indirect evidence of discrimination, the only other avenue of proof available to her is the McDonnell-Douglas burden-shifting

───────────

[4] The only evidence Plaintiff brings forward concerning a coworker's absence is a series of Facebook messages she exchanged with a coworker, Elizabeth Lanning, in fall of 2020. (See Pl.'s Suppl. Resp. (Doc. 48) at 11–12.) The context surrounding these messages is difficult to decipher, but it appears that Elizabeth missed work on October 5, 2020. (See id. (On this date, Plaintiff messaged Elizabeth encouraging her to "get plenty of rest and please take care of yourself.").) Plaintiff argues to this court that "Elizabeth Lanning . . . got pardoned for her sickness of a week, missed work and did not get terminated." (Id. at 3.) However, absent further explanation from Plaintiff, the Facebook messages — which, on their face, only provide evidence of the simple fact that Elizabeth missed work — do not support a finding of disparate treatment. As discussed above, Plaintiff's attempt to draw comparisons with Elizabeth is misplaced, because Plaintiff was terminated not because of her absences alone, but rather because of her failure to communicate those absences, and she has provided no evidence that Elizabeth is similarly situated in this way.

- 13 -

framework. See Rhoads, 257 F.3d at 391-92; see also Adkins v. CSX Transp., Inc., 70 F.4th 785, 792-93 (4th Cir 2023). An employment discrimination plaintiff proceeding through this avenue of proof must first establish a prima facie case of employment discrimination. See Rhoads, 257 F.3d at 392. If the plaintiff is successful in establishing a prima facie case, the burden then shifts to the employer to "to rebut the presumption of [discrimination] by articulating a legitimate [nondiscriminatory] reason for its actions." Id. Finally, the burden shifts back to the plaintiff to "demonstrate that the proffered reason is a pre-text for forbidden [discrimination]." Id. Although the burden of proof shifts at each stage, the "plaintiff always bears the ultimate burden of persuading the trier of fact that she was the victim of [discrimination]." Id.

Below, this court analyzes Plaintiff's ADA claims for wrongful discharge and failure to accommodate and finds that she has failed to establish a prima facie case for either claim.

A.    **Wrongful Discharge**

For ADA wrongful discharge, "a plaintiff establishes a prima facie case if [she] demonstrates that (1) [she] is within the ADA's protected class; (2) [she] was discharged; (3) at the time of [her] discharge, [she] was performing the job at a level that met [her] employer's legitimate expectations; and (4) [her]

- 14 -

discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001); see also Rhoads, 257 F.3d at 387 n.11.

Regarding the first element, "[o]ne is within the ADA's protected class if one is 'a qualified individual with a disability.'" Haulbrook, 252 F.3d at 702 (quoting 42 U.S.C. § 12112). The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the [job]." Id. § 12111(8).

Plaintiff alleges she suffers from, among other disabilities, "IBS, gastroduodenitis, pancreatitis, and PTSD," (Pl.'s Suppl. Pleading (Doc. 25) at 5). The Fourth Circuit requires that litigants claiming to have a disability "produce evidence" of that disability. See Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012). Here, Plaintiff met her burden to "produce evidence" by attaching health records that appear to confirm a diagnosis for IBS. (Doc. 26 at 2.) These records also substantiate her visits to the hospital and the abdominal surgeries that sparked her absences from work in December 2020. (See Doc. 26 at 3–8.) Drawing reasonable

inferences in Plaintiff's favor, it appears that she is an ADA-qualified individual with at least one underlying disability, IBS, thus establishing the first element of a prima facie case for ADA wrongful discharge.

It is also uncontroverted that Plaintiff "was discharged" from her role as a "Dental Assistant II." (see Ex. 5, Separation Notice (Doc. 41-2) at 57). Thus, Plaintiff has established element two of a prima facie case. See Haulbrook, 252 F.3d at 702. However, Plaintiff has not met her burden to establish elements three and four of a prima facie case.

### Element Three: Defendant's Legitimate Expectations

Defendant argues that at the time of Plaintiff's firing on December 9, 2020, Plaintiff "was not fulfilling Defendant's legitimate expectations." (See Def.'s Mem. (Doc. 42) at 12 (referring to the third prima facie element outlined in Haulbrook, 252 F.3d at 702).) Specifically, Defendant argues Plaintiff "failed to notify Defendant of her absences on three consecutive days and failed to respond to attempts to contact her, despite clearly published written policies." (Id.)

Defendant's internal employment policies make clear that employees must inform their supervisors "as soon as [they] know [they] will be . . . absent from work." (Ex. 1, Employee Handbook (Doc. 41-3) at 25.) These policies also state that

- 16 -

"[f]ailure to report to work for three (3) consecutive days without proper notification will be deemed to have voluntarily abandoned your job, and your employment will be automatically terminated." (Id.) Plaintiff agreed to these policies when she began her employment with Defendant. (See Ex. 4, Acknowledgement (Doc. 41-2) at 53.)

Under Defendant's policy, Plaintiff "was to report any absences to [her] direct supervisors Daphne Fuller, Tatiana Pacheco, and/or Leigh-Anne Ennis," or to HR Director, Jim Houck, or to Clinical Operations Supervisor, Heather Barefoot. (Heather Barefoot Aff. (Doc. 41-3) at 4.) Defendant contends that Plaintiff failed to appear at work and failed to report her absences to the required individuals for three consecutive days (Monday, December 7, 2020, through Wednesday, December 9, 2020). (Def.'s Mem. (Doc. 42) at 12; Jim Houck Aff. (Doc. 41-2) at 5.) Plaintiff counters that she "did in fact give [Defendant] notice" of her absences, (Pl.'s Suppl. Resp. (Doc. 48) at 2), and laments Defendant's "rigid" policies, (Pl.'s Resp. (Doc. 44) at 2), believing that her communication to Defendant about her hospitalization and surgery was adequate to meet Defendant's expectations, (see Pl.'s Suppl. Resp. (Doc. 48) at 3).

It is not this court's role to evaluate the propriety of Defendant's decision to discharge Plaintiff, so long as

- 17 -

Defendant has presented evidence that Plaintiff was terminated for failing to meet Defendant's clearly communicated, legitimate expectations.[5] Plaintiff has failed to establish that she was meeting her employer's clearly communicated, legitimate expectations because she violated Defendant's explicit report-or-communicate policy. Plaintiff's arguments, discussed below, that she did adhere to Defendant's communication policies are unavailing and do not create a genuine issue of material fact.

First, Plaintiff argues that she communicated her absence to two of her supervisors, Heather and Daphne, and that they "assured [Plaintiff] they would let HR know [that Plaintiff] would be out of the office." (Pl.'s Resp. (Doc. 44) at 1.) But the facts show that Plaintiff only communicated her absence through December 4, and did not provide notice of her later absences on December 7, 8, or 9. Indeed, both parties attached screenshots showing that Plaintiff texted Daphne on Wednesday, December 2, that she "will not be in tomorrow or Friday." (Pl.'s Suppl. Pleading (Doc. 25) at 15; Ex. 5, Text Messages Between Pl. and Daphne Fuller ("Daphne Messages") (Doc. 47-1) at 147.)

_____

[5] This court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (citation omitted). Additionally, it is not this court's role to decide whether Defendant's reason for firing Plaintiff "was wise, fair, or even correct, ultimately, so long as it truly was the reason for [the firing]." Id. (citation omitted).

- 18 -

Heather contacted Plaintiff to confirm that she would be absent through December 4, (Pl.'s Suppl. Pleading (Doc. 25) at 12 ("Daphne informed me you are out until Friday.")), and then informed Plaintiff that she would pass along word to HR of Plaintiff's absence, (id. at 13 ("I will inform our HR Department along with the office they [sic] you will be out of work.").)

While Plaintiff clearly communicated to her supervisors that she would be absent through Friday, December 4, she never followed up with her supervisors and never indicated that she would require additional time off work the following week. Text messages between Daphne and Heather reveal that on Sunday, December 6, neither supervisor had received an update about "when [Plaintiff] will return to work." (See Ex. 6, Text Messages Between Daphne Fuller and Heather Barefoot I ("Daphne/Heather Messages I") (Doc. 41-3) at 59.) The next day, Monday, December 7, Plaintiff did not show up to work nor communicate with her supervisors about her absence and, as a result, Leigh-Anne Ennis (another of Plaintiff's direct supervisors) sent a group text message addressed to Plaintiff, copying Heather and Daphne, in which Leigh-Anne instructed Plaintiff to "update" her "status" and provide an expected return date. (See Ex. 8, Leigh-Anne Message (Doc. 41-3) at 63–

- 19 -

64.) Plaintiff did not respond to Leigh-Anne's text, despite the fact that the text put Plaintiff on clear notice that her supervisors viewed her as being out of compliance with Defendant's policies.

In sum, based on the record detailed above, it is uncontroverted that Plaintiff communicated to her supervisors that she would be absent through Friday, December 4, but it is equally uncontroverted that she did not communicate with those supervisors about her need for continued absences beyond that date. As a result, when Plaintiff failed to report for work and failed to communicate her absences between Monday, December 7, and Wednesday, December 9, she was in clear violation of Defendant's policies.

Second, Plaintiff appears to argue that she was fulfilling Defendant's expectations because another Lane & Associates employee, Candice Lane, was aware of Plaintiff's absence from work during the week of Monday, December 7. (See Pl.'s Resp. (Doc. 44) at 1; Ex. 2, Pl. Dep. (Doc. 47-1) at 22 ("Candice knew everything about the surgeries and everything.").) Plaintiff's argument that Candice was aware of Plaintiff's absences is substantiated by contemporaneous text messages between the two parties. (See Pl.'s Suppl. Pleading (Doc. 25) at 9-10 (showing texts between Candice and Plaintiff in which Candice checks in

on Plaintiff's recovery and wishes her well).) In Plaintiff's view, because "Candice was introduced as the acting head assistant at the time," (Pl.'s Resp. (Doc. 44) at 1), the fact that Candice was aware of Plaintiff's absence during the week of December 7 should have been enough to satisfy Defendant's policy requiring employees to inform their "supervisors" of absences, (see id.; see also Ex. 1, Employee Handbook (Doc. 41-3) at 25 (outlining Defendant's communication policy)).

This argument is unavailing for several reasons. First, Defendant attached multiple affidavits to its Motion for Summary Judgment which make clear that Candice was "not one of Plaintiff's supervisors upon which proper of notice of absences could be given." (Jim Houck Aff. (Doc. 41-2) at 5; Heather Barefoot Aff. (Doc. 41-3) at 4.) To the extent that Plaintiff had a subjective belief that communicating with Candice was sufficient to satisfy Defendant's policies, this does not create a genuine issue of material fact regarding Defendant's actual, legitimate expectations for communication at the time. Second, on Monday morning, December 7, Leigh-Anne put Plaintiff on explicit notice that she was out of compliance with Defendant's communication policies and instructed her to contact either HR, Heather, Daphne, or Leigh-Anne to update her "status." (See Ex. 8, Leigh-Anne Message (Doc. 41-3) at 63–64.) Despite that clear

indication of expectations, Plaintiff did not respond to Leigh-Anne's text or take any other corrective action. At summary judgment, Plaintiff offers no explanation to this court as to why she neglected to respond to Leigh-Anne's text,[6] or why, when Plaintiff exchanged messages with Candice later that day, she neglected to ask Candice to relay a message to Leigh-Anne, Daphne, Heather, or HR about Plaintiff's need for a prolonged absence.

In sum, Defendant has shown at summary judgment that Defendant did not consider Candice to be a supervisor to whom Plaintiff could communicate absences and that even if Plaintiff believed at the time that Candice was a proper person to notify, Leigh-Anne's Monday, December 7, text message to Plaintiff put Plaintiff on notice that she was out of compliance with Defendant's policies. Despite that notice, Plaintiff failed to take corrective action.

Finally, Plaintiff argues that she was fulfilling Defendant's expectations at the time of her firing because Defendant informed her that she needed only to provide a

_____

[6] Plaintiff states that she had never met Leigh-Anne and that Leigh-Anne "was never introduced to me as a supervisor or manager." (Pl.'s Resp. (Doc. 44) at 1.) However, even accepting this as true, it does not explain why Plaintiff would fail to respond to a group text message that also included Daphne and Heather as co-recipients — the same supervisors Plaintiff had communicated with about her absences the week prior.

doctor's note explaining her absences upon her return to work —
something she was prepared to do, and would have done, had she
not been fired. (See Pl.'s Suppl. Resp. (Doc. 48) at 3; see also
Ex. 7, Duke Health Doctor's Note (Doc. 47-1) at 153.)
Plaintiff's argument appears to be in reference to a text
message Daphne sent to Plaintiff on Wednesday, December 2.
Daphne, responding to Plaintiff's text stating she "will not be
in tomorrow or Friday," sent the following message: "I've
communicated with Heather and I will need a letter upon your
return. I hope you feel better!" (Pl.'s Suppl. Pleading (Doc.
25) at 15.) Nothing in Daphne's text message suggests that her
instruction to Plaintiff to provide "a letter upon return" was
meant to stand in place of Defendant's requirement that
employees "must immediately inform [their] supervisor by
telephone" of any absences. (Ex. 1, Employee Handbook (Doc. 41-
3) at 25.) At the time that Daphne referenced "a letter upon
return," Plaintiff had only communicated to Daphne that she
would be absent through Friday, December 4. (Pl.'s Suppl.
Pleading (Doc. 25) at 15.) Even if Plaintiff temporarily
believed that she had received carte blanche from Daphne to be
absent for as long as necessary, so long as she provided a "a
letter upon return," this belief was no longer reasonable after
Leigh-Anne sent the text message to Plaintiff on the morning of

- 23 -

Monday, December 7, notifying Plaintiff that she was out of compliance with Defendant's communication policies.

At bottom, none of Plaintiff's arguments that "[she] was performing the job at a level that met [her] employer's legitimate expectations" at "the time of [her] discharge," see Haulbrook, 252 F.3d at 702, are sufficient to create a genuine dispute of material fact. Instead, Defendant has shown at summary judgment that Plaintiff's failure to report to work and failure to communicate with her supervisors about her absences for three consecutive days fell short of Defendant's "legitimate expectations" for employee communication. As a result, Plaintiff has failed to establish the third element of a prima facie case for wrongful discharge.

**Element Four: Reasonable Inference of Unlawful Discrimination**

For many of the same reasons that Plaintiff's conduct failed to meet the legitimate expectations of her employer, the circumstances of Plaintiff's discharge also do not "raise a reasonable inference of unlawful discrimination." See Haulbrook, 252 F.3d at 702. Rather, as discussed above, the record before this court reveals that after Plaintiff initially communicated to her supervisors that she would be absent through Friday, December 4, she provided no further updates nor communication about her continued absences from work the following week. (See

- 24 -

Ex. 6, Daphne/Heather Messages I (Doc. 41-3) at 59; Ex. 7, Text
Messages Between Daphne Fuller and Heather Barefoot II
("Daphne/Heather Messages II") (Doc. 41-3) at 61.)

On Monday morning, December 7, Plaintiff's supervisors
noted her absence, (see id.), and texted Plaintiff informing her
that she needed to update her status, (see Ex. 8, Leigh-Anne
Message, (Doc. 41-3) at 63). After a third consecutive day in
which Plaintiff missed work and did not communicate with her
supervisors, those supervisors notified Defendant's HR Director,
Jim Houck, about Plaintiff's failure to comply with Defendant's
"Attendance and Leave Policies," (see Ex. 9, Text Messages
Between Daphne Fuller and Heather Barefoot III ("Daphne/Heather
Messages III") (Doc. 41-3) at 66; Ex. 10, Heather Barefoot Email
to Jim Houck (Doc. 41-3) at 68), and initiated the process of
firing Plaintiff, (see Ex. 5, Separation Notice (Doc. 41-2) at
57). Ultimately, Defendant fired Plaintiff, citing the clause in
Defendant's employee handbook that calls for the automatic
termination of employees who fail to report to work or
communicate with their supervisors for three consecutive days.
(See id.; see also Ex. 1, Employee Handbook (Doc. 41-3) at 25.)

In sum, the circumstances of Plaintiff's discharge make
clear that Plaintiff was fired for violating Defendant's
"Attendance and Leave Policies" and not on account of unlawful

- 25 -

discrimination.[7] Therefore, Plaintiff has failed to establish the fourth element of a _prima facie_ case.[8]

## B.  **Failure to Accommodate[9]**

"To establish a prima facie case for failure to accommodate, [a plaintiff] must show: '(1) that she was an individual who had a disability within the meaning of the

_____

[7] This finding is further supported by the fact that Plaintiff's supervisors sent her pleasant text messages, wished Plaintiff well, and approved of her absence when she communicated her need to miss work through Friday, December 4. (See Pl.'s Suppl. Pleading (Doc. 25) at 11 ("I am sorry you are sick . . ."); id. at 13 ("Hopefully all will go easy and I wish you a speedy recovery . . . Good luck!!"); id. at 15 ("I hope you feel better! . . . Hope all is well with you!!"); id. at 16 ("Take it easy.").) Plaintiff's trouble began not when she fell ill, but rather when she stopped communicating with her supervisors about her need for additional time off work.

[8] Even assuming Plaintiff has established a _prima facie_ case of wrongful discharge, her claim would still fail at the next stages of the McDonnell-Douglas framework. See Rhoads, 257 F.3d at 392. That is, Defendant put forward a legitimate, nondiscriminatory reason for Plaintiff's firing — her failure to show up to work or notify her supervisors for three consecutive days — that is fully consistent with its established policies. With the burden shifting back to Plaintiff at the third stage of McDonnell-Douglas, Plaintiff has not forecast any evidence to "demonstrate that the proffered reason [for her firing] is a pre-text for forbidden [discrimination]." Id.

[9] It is not clear that the McDonnell-Douglas burden-shifting framework applies to ADA reasonable accommodation claims. See, e.g., Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 572–82 (4th Cir. 2015)(invoking the McDonnell-Douglas framework at summary judgment to analyze a plaintiff's ADA wrongful discharge and retaliation claims but evaluating only the _prima facie_ case for her failure-to-accommodate claim). Here, Plaintiff has failed to establish even a _prima facie_ case of ADA failure-to-accommodate. Therefore, this court need not contemplate whether to apply later stages of the McDonnell-Douglas framework.

statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; (4) that the employer refused to make such accommodations.'" Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 579 (4th Cir. 2015) (cleaned up) (citation omitted). To prevail on a failure-to-accommodate claim, a plaintiff must have made "an adequate request" for accommodation, "thereby putting the employer on notice" of its "duty to provide [a] reasonable accommodation[]." Lashley v. Spartanburg Methodist Coll., 66 F.4th 168, 179 (4th Cir. 2023) (citation omitted).

Here, Plaintiff claims that Defendant failed to provide her "reasonable accommodation request for temporary leave." (Pl.'s Suppl. Pleading (Doc. 25) at 5.) However, Plaintiff produces no evidence to show that she ever requested "temporary leave" from Defendant. Instead, the record shows, at best, that Plaintiff requested time off from work between Wednesday, December 2, and Friday, December 4. (Id. at 11–16.) Defendant granted that time off. (Id. at 13.) Plaintiff did not request permission for "leave" beyond those dates. Because Plaintiff never put Defendant on notice of her need for an accommodation — such as time away from work — after December 4, her failure-to-

- 27 -

accommodate claim fails as a matter of law. See Lashley, 66 F.4th at 179.

## V.    CONCLUSION

Plaintiff has failed to establish a prima facie case for her ADA wrongful discharge and failure-to-accommodate claims. For the foregoing reasons, Defendant's Motion for Summary Judgment, (Doc. 41), will be granted.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (Doc. 41), is **GRANTED** and Plaintiff's Complaint is **DISMISSED.**

A Judgment dismissing this action will be entered contemporaneously herewith.

This the 30th day of December, 2024.

_____
United States District Judge

- 28 -